09-1553-cv, 09-1571-cv, 09-1554-cv
Clear Channel Outdoor Inc. v. City of New York; Metro Fuel LLC. v. City of New York

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2009

(Argued: November 16, 2009      Decided: February 3, 2010)

Docket Nos. 09-1553-cv; 09-1554-cv; 09-1571
(consolidated for disposition)

CLEAR CHANNEL OUTDOOR, INC., ATLANTIC OUTDOOR
ADVERTISING, INC., SCENIC OUTDOOR, INC.,
TROYSTAR CITY OUTDOOR LLC, and WILLOW MEDIA,
LLC,

*Consolidated-
Plaintiffs-Appellants*,

–v.–

CITY OF NEW YORK and PATRICIA J. LANCASTER,
in her official capacity as
Commissioner of the New York City
Department of Buildings,

*Defendants-Appellees*,

EDWARD FORTIER,

*Consolidated-Defendant-
Appellee.*

METRO FUEL LLC,

-1-

                                    *Plaintiff-Appellant,*

                              –v.–

                    CITY OF NEW YORK,

                                    *Defendant-Appellee.*

———————————————————

Before:   POOLER and WESLEY, *Circuit Judges*, and KEENAN,
          *District Judge.*[*]

     Appeal from an order of the District Court for the Southern District of New York (Crotty, J.), entered on March 31, 2009, granting summary judgment to Defendants, and finding that the challenged provisions of the New York City Zoning Resolution do not impose unconstitutional restrictions on Plaintiffs' commercial speech rights in violation of the First Amendment or the New York State Constitution.

                         **AFFIRMED.**

———————————————————

          VICTOR A. KOVNER (James Eric Rosenfeld and Linda Jane
                Steinman, *on the brief*), Davis Wright Tremaine
                LLP, New York, New York, *for Clear Channel
                Outdoor, Inc.*

          RICHARD D. EMERY, Emery Celli Brinckerhoff & Abady
                LLP, New York, New York, *for Atlantic Outdoor
                Advertising, Inc., Scenic Outdoor, Inc.,
                Troystar City Outdoor LLC,* and *Willow Media,
                LLC.*

          ERIC J. HECKER, Emery Celli Brinckerhoff & Abady
                LLP, New York, New York, *for Metro Fuel.*

          KAREN M. GRIFFIN, New York City Law Department, New

---

[*] The Honorable John F. Keenan, United States District Judge for the Southern District of New York, sitting by designation.

York, New York, *for The City of New York, Patricia J. Lancaster, in her official capacity as Commissioner of the New York City Department of Buildings,* and *Edward Fortier.*

---

WESLEY, *Circuit Judge*:

## I. BACKGROUND

Plaintiffs, owners of billboards and panel signs in New York City, appeal from an Opinion and Order of the District Court for the Southern District of New York granting summary judgment to Defendants, the City of New York, Patricia J. Lancaster, named in her official capacity as Commissioner of the New York City Department of Buildings, and Edward Fortier, Director of Padlock and Enforcement (collectively the "City"). *Clear Channel Outdoor, Inc. v. City of N.Y.*, 608 F. Supp. 2d 477 (S.D.N.Y. 2009) (Crotty, J.). The district court found that the challenged provisions of New York City's Zoning Resolution did not impose unconstitutional restrictions on Plaintiffs' commercial speech rights in violation of the First Amendment or the New York State Constitution. *Id.* at 481, 508.

The district court's opinion applies to two cases,

argued in tandem before this Court.[1]  The first case is the consolidated action of Plaintiffs Clear Channel Outdoor, Inc., Atlantic Outdoor Advertising, Inc., Scenic Outdoor, Inc., Troystar City Outdoor LLC, and Willow Media, LLC (collectively, the "Clear Channel Plaintiffs" or "Clear Channel").  The Clear Channel Plaintiffs own large billboards located near arterial highways in New York City.[2]  Clear Channel operates an estimated 236 signs throughout New York City; approximately 85 of these signs face arterial highways.  The Clear Channel signs that form the basis of this dispute are illuminated and range in size from 315 square feet to 11,258 square feet.

The Clear Channel Plaintiffs specifically challenge New York City Zoning Resolution §§ 42-55 and 32-662, which ban offsite advertising signs within 200 feet of, and within sight of, arterial highways in manufacturing and commercial

---

[1] The factual background giving rise to these disputes is set out in detail in the district court's opinion. *Clear Channel Outdoor*, 608 F. Supp. 2d at 481-84.  We assume familiarity with that background.

[2] The roads designated as arterial highways in New York City include more than 70 expressways, parkways, boulevards, and toll crossings. *See* N.Y. City Zoning Resolution App'x C: Designation of Arterial Highways.

districts. They also challenge the attendant enforcement regime set forth in New York City Local Law 14 of 2001, Local Law 31 of 2005, and Department of Buildings ("DOB") Rule 49 (collectively the "Regulations") as applied to their current inventory of arterial signs in New York City.

The second case involves Plaintiff Metro Fuel LLC, which owns smaller "panel" advertising signs.[3] Metro Fuel's panel signs are internally illuminated poster advertisements that are approximately 24 square feet. Metro Fuel's signs are either placed on undeveloped lots, such as parking lots, affixed to the front of businesses, usually at or near ground level, or placed inside parking garages near the means of ingress and egress. Metro Fuel operates an

---

[3] As defined by the New York City regulation, an "advertising sign" is a sign that directs attention to a business, profession, commodity, service, or entertainment that is conducted, sold, or offered elsewhere than upon the premises where the sign is located. New York City Zoning Resolution § 12-10. A sign is not an "advertising sign" if it is "accessory to a use located on the zoning lot." *Id.* An "accessory sign" directs attention to a business or profession conducted on the premises where the sign is located. *Id.* Accessory signs are permitted in all commercial and manufacturing districts, subject to height, size, illumination, and projection limitations. *Id.* § 32-62.

estimated 440 panel signs in New York City. The challenged City regulations impact approximately 324 of Metro Fuel's panel signs.

Plaintiff Metro Fuel is not generally affected by the provisions of the Zoning Resolution that address arterial advertising signs. Rather, Metro Fuel challenges those aspects of the Zoning Resolution that control where it may place its panel advertisements, and how it may illuminate them.

**A.   History of the New York City Zoning Resolution**

Since 1940, New York City's zoning regulations have banned outdoor advertising companies from placing commercial billboards, which do not advertise on-premises businesses, within 200 feet and within view of the City's major parkways and roadways. *See Infinity Outdoor, Inc. v. City of N.Y.*, 165 F. Supp. 2d 403, 406 (E.D.N.Y. 2001). On-premises signs are defined as "business signs" in the 1940 Zoning Resolution and as "accessory signs" in a 1961 revision of the Zoning Resolution. The 1961 Zoning Resolution added location and illumination restrictions relevant to Metro Fuel's panel signs.

The basic prohibition contained in the 1940 Zoning Resolution remains in force today in manufacturing and certain commercial districts where advertising signs are permitted. During the periods between 1940 and 1979 arterial advertising signs were erected and maintained in violation of the Zoning Resolution. Enforcement efforts by the City were rare.

In 1965, Congress enacted the Highway Beautification Act to "protect the public investment" in highways, to "promote the safety and recreational value of public travel, and to preserve natural beauty."[4] 23 U.S.C. § 131(a). In order to comply with the Highway Beautification Act, New York City granted legal non-conforming status to existing advertising signs that failed to comply with Zoning Resolution provisions, but which complied with state and federal standards. The signs that did not comply with state and federal standards remained illegal.

The City Council amended the Administrative Code in

---

[4] States that did not comply with the requirements of the Act would be in jeopardy of losing up to ten percent of their annual federal aid highway funds. *See* 23 U.S.C. § 131(b).

2001 by adopting Local Law 14, which sought to enhance the City's ability to enforce the arterial advertising regulations.[5] In a public hearing regarding the amendment, the President of the New York Outdoor Advertising Group (a then-existing industry group comprised of several outdoor advertising companies) submitted written materials admitting that "the outdoor advertising industry unquestionably employed *creative* methods to obtain building permits for

---

[5] Local Law 14 established a permitting scheme for all arterial signs, N.Y. Admin. Code §§ 26-253 to 26-255, created a registration system for outdoor advertising companies, *id.* § 26-260. The law also imposed a requirement that each outdoor advertising company provide the New York City Department of Buildings ("DOB") with an inventory of all of its signs, including a certification that all signs are in compliance with the Zoning Resolution. *Id.* §§ 26-260 to 26-261. In addition, Local Law 14 provided the DOB with the authority to "revoke, suspend or refuse to renew the registration of an outdoor advertising company or impose fines or other penalties where it is determined by the Commissioner, after notice and an opportunity to be heard," that an outdoor advertising company "made statements that it knew or should have known [we]re false in any application or certification filed with the" DOB, failed to provide an inventory of its signs, or otherwise "violated the DOB's rules pertaining to outdoor advertising." N.Y. Admin. Code § 26-260(d). Finally, Local Law 14 provided for civil and criminal penalties, and provided a mechanism for the DOB to bring a nuisance abatement action for noncompliance. *Id.* §§ 26-256, 26-262.

arterial highway signs." Neufeld Decl. ¶ 21, May 12, 2008 (emphasis added).

The President of the Outdoor Advertising Group did not dispute that the industry routinely claimed that advertising signs would be used for permissible on-premises accessory business purposes in order to obtain permits from the DOB. Despite these representations made to the DOB, the signs were in fact used for offsite advertising purposes, which were proscribed under the applicable regulations. Some outdoor advertising companies, including the Plaintiffs, also erected billboards without obtaining permits of any kind.

In 2005, the City Council adopted Local Law 31 that revised Local Law 14 in various ways, but preserved the main requirements and provisions of Local Law 14 at issue in this case. Neither Local Law went into effect in material part until the DOB promulgated Rule 49 on July 26, 2006.[6]

---

[6] Rule 49 requires that outdoor advertising companies submit an inventory of their signs and structures located within 900 feet, and within view, of an arterial highway. Rules of the City of New York § 49-15(a). When applicable, documentation must also be submitted that establishes that a sign has been granted non-conforming use status. *Id.* § 49-15(d)(15).

## B.  The Current Controversy

Plaintiffs do not dispute the City's authority to enact and enforce regulations tailored to address outdoor commercial advertising.  However, they argue that "loopholes and inconsistencies in the regulatory regime" prevent the regulations from advancing a substantial government interest, rendering it invalid under the First Amendment.

### 1.  The Clear Channel Plaintiffs

The Clear Channel Plaintiffs first contend that the City's sporadic enforcement of its regulatory regime from 1940 to 2001 undermines its validity.  They state that "a great number of . . . signs were built abutting the arterial highways from 1940 through 2001.  In general, the City issued permits for large accessory signs along the arterial highways, and, without permission, the sign owners converted the signs to advertising signs."  Plaintiffs maintain that the "City has sought to newly enforce its ban on arterial advertising signs on private property while permitting offsite advertising signs on government property, including on billboards, bus shelters, subway[] entrances and phone kiosks, several hundred of which are within 200 feet of an

-10-

arterial highway."[7]  In support of this assertion, Plaintiffs allege that "there are currently between 1,400 and 1,600 advertising signs on government or public property on billboards, bus shelters, phone kiosks and subway[] panels on roadways designated as arterial highways or blocks intersecting with arterial highways."

Plaintiffs next draw our attention to a few specific inconsistencies in the applicable regulations, which the City subsequently remedied.  First, two Clear Channel signs, both measuring 960 square feet and located within 200 feet and in view of the Belt Parkway in Brooklyn.  Following the commencement of these lawsuits, the City declined to renew Clear Channel's lease to maintain these signs and requested that the signs be taken down.  Second, arterial advertising signs on City-owned property located within 200 feet, and within view of, the West Side Highway.  Plaintiffs acknowledge that the company that operates these signs has

---

[7] Essentially, Plaintiffs have benefitted from their own misconduct and now suggest to this Court that the City should be precluded from enforcing its zoning scheme because it has not always enforced its regulations in a manner that would allow it to achieve full compliance.  That cannot be the law.

entered into an agreement with the City to remove these signs. Yet, Plaintiffs maintain that these signs undermine the alleged purposes of the Zoning Resolution and render it an unconstitutional restraint on commercial speech.

The Clear Channel Plaintiffs maintain that "[o]ne of the most glaring inconsistencies in the regulatory scheme is the exemption for Arterial Advertising Signs on Transit Authority Property." As the district court noted, the "parties disagree over the City's reasons for not enforcing its laws on [the property controlled by the Metropolitan Transit Authority ('MTA'), the Port Authority of New York and New Jersey (the 'Port Authority'), and Amtrak,] and the City's good faith in prospectively enforcing the Zoning Resolution." *Clear Channel*, 608 F. Supp. 2d at 489. City officials claim that they did not enforce the Zoning Resolution against the MTA, the Port Authority, or Amtrak because they believed that they did not have the authority to do so. The City now concedes that it has the legal authority to enforce the Zoning Resolution against properties owned or controlled by the MTA, including the Long Island Railroad ("LIRR") and the Metro North Railroad.

*Clear Channel*, 608 F. Supp. 2d at 489.

The Clear Channel Plaintiffs take the position that "New York City viewed increased revenues for mass transit — not aesthetics or traffic safety — as the paramount concern in actively supporting an exemption for Transit Authority signs from its zoning regulations." Plaintiffs contend that "the City has made a concerted effort over several decades . . . not to enforce the Arterial Advertising Ban against billboards on any railroad property, including billboards on the MTA, LIRR, Conrail, Amtrak and other railroad or Port Authority property."

Finally, Plaintiffs dispute the validity of the City's proffered justification for its regulatory scheme — the desire to promote traffic safety and aesthetics. They assert that "there is no credible evidence that these signs, which have stood [illegally] for years and often decades, have created any traffic problems." Clear Channel Outdoor, Inc., Second Am. Compl. ¶ 3.

**2. Metro Fuel: The Street Furniture Franchise**

In 2006, the City entered into a 20-year non-exclusive franchise contract (the "Street Furniture Franchise") with a

private company, Cemusa, Inc. ("Cemusa"), for the installation, operation, and maintenance of bus shelters, automatic public toilets, newsstands, and other "public service structures." Pursuant to this contract, the City shares in revenue generated by advertisements located on the street furniture structures. There are allegedly 128 "urban panels," which are mounted on the railings of sidewalk subway entrances near roads that have been designated by the City as arterial highways and an additional 24 urban panels on subways entrances on blocks that intersect with arterial highways.

Metro Fuel argues that the City's street furniture franchise allows Cemusa to place advertisements on bus shelters that are similar to their advertisements, but which are not subject to the Zoning Resolution. Indeed, Metro Fuel alleges that the City expressly amended its Administrative Code to permit advertising on the exterior of newsstands in conjunction with its contract with Cemusa. Metro Fuel maintains that this exception is evidence of the regulation's asserted constitutional infirmity.

With respect to Metro Fuel, the City concedes that

Metro Fuel's "panel signs are signs of approximately the same size as, and sited in approximately the same manner as, the advertisements on the City's bus stop shelters."  But, the City maintains that "the provisions of the Zoning Resolution which restrict the permissible locations of panels signs, as well as the size, height, and illumination of such signs, are generally designed to protect neighborhood character, consistent with zoning designations, and to address aesthetic concerns."  Essentially, the City argues that Metro Fuel's panel signs can be permissibly distinguished from the permissible coordinated street furniture.

## II.  PROCEDURAL HISTORY

Clear Channel filed its complaint against Defendants on October 6, 2006.[8]  The City moved for summary judgment

---

[8] Subsequent to the filing of Clear Channel's complaint, Atlantic Outdoor, Scenic Outdoor, Troystar City Outdoor, and Willow Media all filed complaints against the City, which were consolidated with the Clear Channel action on October 20, 2006, pursuant to Federal Rule of Civil Procedure 42(a).  The consolidated Plaintiffs filed a motion for a preliminary injunction to prevent enforcement of the arterial advertising restrictions, Local Law 14, Local Law 31, and DOB Rule 49.  In response, the City stayed enforcement of the challenged regulations until the

against the Clear Channel Plaintiffs on May 12, 2008. On June 23, 2008, the Clear Channel Plaintiffs cross-moved for summary judgment. Metro Fuel filed its complaint against Defendants on September 21, 2007. Metro Fuel filed a motion for summary judgment or, alternatively, for a preliminary injunction on July 28, 2008. The City cross-moved for summary judgment against Metro Fuel on August 25, 2008.

In a well-reasoned opinion, the district court concluded that there were "no issues of material fact in either of the cases." *Clear Channel*, 608 F. Supp. 2d at 515. It held that "[a]ny factual disputes are trivial, non-essential, and do not materially affect the outcome of the cases." *Id.* The court found a grant of summary judgment in favor of the City appropriate because the "City's zoning regulations . . . satisfy the constitutional test for commercial speech restriction and are not unconstitutionally underinclusive." *Id.*

In reaching its conclusion that the City's zoning regulations pass constitutional muster, the court determined that the City "has substantial interests in restricting

resolution of this litigation.

-16-

outdoor advertising signs near highways, its zoning ordinance will directly advance those interests, and the regulations are not more extensive than necessary." *Id.* The district court found that the "few exceptions to the ban on off-site commercial arterial advertising that remain along the City's roads do not undermine the constitutionality of the Zoning Resolution." *Id.* The court further noted that the City is permitted "to value one type of commercial speech over another." *Id.* at 500.

The district court also concluded that the registration and documentation requirements challenged by Plaintiffs "also pass constitutional muster." *Id.* at 515. It ruled that the "provisions of Rule 49 directly advance the City's interests in traffic safety and aesthetics and [that] . . . the regulations are narrowly tailored" to meet the City's goals. *Id.* at 507.

Finally, the district court rejected Plaintiffs' challenge based on the New York State Constitution. *See* N.Y. Const. art. I, § 8. It found "no indication either in the case law or in the parties' arguments that the New York State courts impose a stricter test for commercial speech

regulation." *Clear Channel*, 608 F. Supp. 2d at 508.

### III.  DISCUSSION

**A.  Standard of Review**

It is well settled that summary judgment may be granted only if there is "no genuine issue as to any material fact." Fed. R. Civ. P. 56(c)(2).  We review *de novo* the district court's grant of summary judgment.  *N.Y. State Rest. Ass'n v. N.Y. City Bd. of Health*, 556 F.3d 114, 122 (2d Cir. 2009).  The "scope of our review . . . does not change where, as here, summary judgment was granted to one party and denied to the other in the procedural context of cross-motions.  Indeed, cross-motions are no more than a claim by each side that it alone is entitled to summary judgment." *N.Y. State Ass'n of Realtors, Inc. v. Shaffer*, 27 F.3d 834, 838 (2d Cir. 1994) (internal citations, quotation marks, and alteration omitted).  In cases such as this one, in which claims are raised under the First Amendment, we have "an obligation to make an independent examination of the whole record." *Bose Corp. v. Consumers Union*, 466 U.S. 485, 499 (1984) (internal quotation marks omitted).

**B.  The *Central Hudson* Test**

It is clear that the advertisements in question involve commercial speech. *See Bad Frog Brewery, Inc. v. N.Y. State Liquor Auth.*, 134 F.3d 87, 96-97 (2d Cir. 1998). In *Central Hudson*, the Supreme Court articulated the current test for assessing the constitutionality of restrictions on commercial speech.[9] *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 563-66 (1980); *see also Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 367-68 (2002) (reaffirming application of *Central Hudson* test in commercial speech cases).

As a threshold matter, in order to warrant First Amendment protection under the *Central Hudson* framework, the communication must be "neither misleading nor related to unlawful activity." 447 U.S. at 564. That the commercial speech at issue in this case is lawful and not misleading, and therefore entitled to First Amendment protection, is not in dispute. *See Clear Channel*, 608 F. Supp. 2d at 494 n.21.

A governmental entity that wishes to regulate protected commercial speech "must assert a substantial interest to be

---

[9] For a brief recitation of the development of the commercial speech doctrine, see, for example, *United States v. Edge Broad. Co.*, 509 U.S. 418, 426 (1993).

achieved" by the restrictions.  *Cent. Hudson*, 447 U.S. at 564.  The "twin goals" of protecting the aesthetic appearance of a city and maintaining traffic safety are "substantial government goals."[10]  *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507-08 (1981); *see also Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 551 (2001); *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 806-07 (1984); *Long Island Bd. of Realtors, Inc. v. Vill. of Massapequa Park*, 277 F.3d 622, 627-28 (2d Cir. 2002).  Plaintiffs do not disagree that the City's asserted interests in this case are "substantial."

In order to satisfy constitutional requirements, as set out in *Central Hudson*, the restriction must satisfy two further criteria.  "First, the restriction must directly

---

[10] Additionally, we have held that a governmental entity "need not rely on the justifications offered . . . when the [regulation] was enacted, since any insufficiency in the original motivation does not diminish other interests that the restriction may now serve."  *Anderson v. Treadwell*, 294 F.3d 453, 461 n.5 (2d Cir. 2002) (internal quotation marks omitted).  Thus, to the extent that Plaintiffs assert that the City's proffered justifications for the Zoning Resolution were not raised at the time of its enactment, such complaints do not further their position in this litigation.

advance the state interest involved"; and second, it must not be "more extensive than is necessary to serve that interest." *Cent. Hudson*, 447 U.S. at 564, 566. The City bears "the burden of establishing a reasonable fit between the [regulatory scheme's] ends and the means chosen to accomplish those ends." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 414 (1993) (internal quotation marks omitted).

**C.   The City is Not Required to Adopt the Least Restrictive Means of Regulating Outdoor Commercial Advertising**

The dictates of *Central Hudson* do not require the City to adopt the "least restrictive means" of advancing its asserted interests. *Bd. of Tr. of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477 (1989). As the Supreme Court has made clear, "'commercial speech [enjoys] a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values,' and is subject to 'modes of regulation that might be impermissible in the realm of noncommercial expression.'"[11] *Id.* (quoting *Ohralik*

[11] Commercial speech requires less robust protection than other forms of speech that must be more carefully guarded, such as political or religious speech. This is so because "commercial speech is more durable than other types

-21-

*v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978)).

In declining to require that the government employ the least restrictive means in regulating commercial speech, the Supreme Court has explained that this means that "we have not insisted that there be no conceivable alternative, but only that the regulation not burden substantially more speech than is necessary to further the government's legitimate interests. And we have been loath to second-guess the [g]overnment's judgment to that effect." *Fox*, 492 U.S. at 478 (internal citation and quotation marks omitted); *see also Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 188 (1999). Thus, what is "require[d] is a fit between the legislature's ends and the means chosen to accomplish those ends — a fit that is not necessarily perfect, but reasonable; that represents not necessarily the

---

of speech, since it is the offspring of economic self-interest." *Discovery Network*, 507 U.S. at 439 (internal quotation marks omitted) (Rehnquist, C.J., dissenting). And, commercial speech is also understood as "less central to the interests of the First Amendment" than other forms of speech. *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 759 n.5 (1985). "The protection available for particular commercial expression turns on the nature both of the expression and of the governmental interests served by its regulation." *Cent. Hudson*, 447 U.S. at 563.

-22-

single best disposition but one whose scope is in proportion to the interest served." *Fox*, 492 U.S. at 480 (internal citations and quotation marks omitted).

Supreme Court precedent instructs that, if the City's determination about how to regulate outdoor commercial advertising is "reasonable" — and we find that it is in this case — then we should defer to that determination. *See Ward v. Rock Against Racism*, 491 U.S. 781, 800 (1989); *see also Riel v. City of Bradford*, 485 F.3d 736, 753-54 (3d Cir. 2007) (stating that "government should not be left with a choice of enacting a regulation banning [or burdening] all signs in a particular geographic area or none" (internal quotation marks omitted) (alteration in original)). And, in considering the validity of the City's zoning scheme, we must examine the regulations in relation "to the overall problem the government seeks to correct." *Ward*, 491 U.S. at 801.

In this case, Metro Fuel characterizes the City's regulatory scheme as premised on a "radical urban design theory." However, it is not this Court's role to second guess the City's urban planning decisions. Similarly, the

-23-

Clear Channel Plaintiffs contend that the City should have adopted a "size and spacing" regulatory regime. The City's rejection of an alternative model does not invalidate the regime selected by the City. *See, e.g.*, *Fox*, 492 U.S. at 478; *Prime Media, Inc. v. City of Brentwood*, 398 F.3d 814, 820-21 (6th Cir. 2005); *Treadwell*, 294 F.3d at 463. However, the City is afforded "considerable leeway . . . in determining the appropriate means to further a legitimate governmental interest, even when enactments incidentally limit commercial speech." *Vill. of Massapequa Park*, 277 F.3d at 627-28; *see also Taxpayers for Vincent*, 466 U.S. at 815-16; *Naser Jewelers, Inc. v. City of Concord*, 513 F.3d 27, 35 (1st Cir. 2008). That the City considered, and rejected, an alternative scheme is of no constitutional moment. *See Ward*, 491 U.S. at 797-98.

**D.   Underinclusivity**

In this case, Plaintiffs' challenge to the zoning regime under the final two prongs of *Central Hudson* centers primarily on their contention that the regulations are unconstitutionally underinclusive. They argue that the Zoning Resolution does not "fit" with the City's stated

-24-

objectives.  *See Edge Broad. Co.*, 509 U.S. at 427-28.

The Supreme Court has explained that a regulation may be unconstitutional if it "in effect restricts too little speech because its exemptions discriminate on the basis of the signs' messages."  *City of Ladue v. Gilleo*, 512 U.S. 43, 50-51 (1994).  There is no basis for finding this form of content-based discrimination in this case.[12]  *Cf. Linmark*

---

[12] There is also no basis for a finding that the City's Zoning Resolution impermissibly favors government speech over private speech.  It is well established that, "[i]n the realm of private speech or expression, government regulation may not favor one speaker over another."  *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995).  However, the zoning regulations at issue cannot be said to function as an "attempt to give one side of a debatable public question an advantage in expressing its views to the people."  *Ladue*, 512 U.S. at 51 (internal quotation marks omitted).  Rather, the zoning scheme is an attempt to control the location of outdoor commercial advertising.  *See Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 174 (2d Cir. 2006).  While the City may not discriminate between speakers or viewpoints, it "may value one category of commercial speech over another where it has valid reasons for doing so."  *Clear Channel*, 608 F. Supp. 2d at 502 (citing *Metromedia*, 453 U.S. at 511-12).  Thus, the "City is free to value a controlled and harmonious streetscape without compromising its ability to restrict uncontrolled and obtrusive advertising on the City's arterial road network."  *Id.*  And, "[t]he City has stated that it will enforce the Zoning Resolution against all billboards on City and government property, where it is

-25-

*Assocs., Inc. v. Twp. of Willingboro*, 431 U.S. 85, 93-98 (1977); *Nat'l Adver. Co. v. Town of Niagra*, 942 F.2d 145, 147-48 (2d Cir. 1991).

A related form of impermissible underinclusivity is presented by a regulation that draws arbitrary distinctions, or that draws distinctions that "bear[] no relationship *whatsoever* to the particular interests that the city has asserted." *Discovery Network*, 507 U.S. at 424. Plaintiffs contend the Zoning Resolution is underinclusive because no meaningful distinctions exist between their regulated signs and billboards, and legally permissible advertising. A regulation may also be deemed constitutionally problematic if it contains exceptions that "undermine and counteract" the government's asserted interest. *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 489 (1995). These two forms of underinclusivity are at the heart of Plaintiffs' challenge.

**1.  *Metromedia* Governs Plaintiffs' Challenge**

The Supreme Court's decision in *Metromedia, Inc. v. City of San Diego* is controlling. 453 U.S. 490 (1981). The relevant portion of the ordinance at issue in *Metromedia*

---

empowered and authorized to do so." *Id.*

-26-

banned offsite commercial advertising signs, but not onsite signs.[13]  *Id.* at 493 n.1.  The ordinance also provided an exception for "signs falling within 12 specified categories."[14]  *Id.* at 494.  In *Metromedia*, the plaintiffs argued "that the city denigrates its interest in traffic safety and beauty and defeats its own case by permitting onsite advertising and other specified signs."  *Id.* at 510-11.

The Court rejected the *Metromedia* plaintiffs' underinclusivity argument.  It held that even though the ordinance did not apply to onsite advertising, it still directly advanced the City of San Diego's interests in

---

[13] The ordinance at issue in *Metromedia* also banned non-commercial signage.  A majority of the Court upheld the regulation only as it pertained to commercial speech.  *See* 453 U.S. at 512-13.  In this appeal, we are only concerned with the City's regulation of outdoor advertising of billboards and signs containing commercial speech.

[14] The specified categories exempted from the City of San Diego's sign ordinance included: government signs; signs located at public bus stops; signs manufactured, transported or stored within the city, if not used for advertising purposes; signs within malls, courts, and arcades; for sale and for lease signs; signs on public and commercial vehicles; signs depicting time, temperature, and news; signs on public transportation, including buses and taxis; and signs on commercial vehicles.  453 U.S. at 494-95.

traffic safety and aesthetics.  *Id.* at 511.  The Court concluded that the city could permissibly distinguish between different forms of advertisements.  *Id.* at 511-12. Lastly, the Supreme Court held that it did not offend the Constitution for San Diego to "distinguish between the relative value of different categories of commercial speech."  *Id.* at 514.

Plaintiffs in this case argue that the City violates the protections afforded commercial speech when it distinguishes between their signs or billboards and those located on government property.  But, the Supreme Court has already rejected "the argument that a prohibition against the use of unattractive signs cannot be justified on [a]esthetic grounds if it fails to apply to all equally unattractive signs wherever they might be located." *Taxpayers for Vincent*, 466 U.S. at 810.  It is clear that, despite its exceptions, New York City's Zoning Resolution directly advances its interests in traffic safety and aesthetics.  *See Posadas de P.R. Assocs. v. Tourism Co. of P.R.*, 478 U.S. 328, 342 (1986).  Indeed, in *Metromedia*, the Court made explicit reference to the exceptions to the ban

of offsite advertising, but did not find the exemptions constitutionally problematic.  453 U.S. at 495.

Plaintiffs' argument hinges, in part, on the assertion that the City's regulatory regime runs afoul of the First Amendment because it does not *fully* accomplish the articulated objectives.  However, contrary to Plaintiffs' contentions, the Supreme Court has previously rejected that argument.  Of particular relevance to this case, in *Metromedia*, the Court rejected the same contention raised here: that the ban on offsite advertising was unconstitutionally underinclusive because it did not extend to onsite advertising.  *Id.* at 511; *see also Posadas*, 478 U.S. at 342 (rejecting the claim that a ban on promotional advertising of casino gambling aimed at Puerto Rican residents was invalid because other types of gambling were permitted to be advertised to local residents).

Plaintiffs next argue that the City's contract to permit coordinated advertising on street furniture makes the Zoning Resolution unconstitutionally underinclusive.  On this point, we find persuasive the Ninth Circuit's decision in *Metro Lights, LLC v. City of Los Angeles*, 551 F.3d 898

-29-

(9th Cir. 2009), *cert. denied*, No. 09-259, — S. Ct. —, 2009 WL 2761319 (Dec. 14, 2009). In *Metro Lights*, the Ninth Circuit considered the question of "whether a city violates the First Amendment by prohibiting most offsite commercial advertising while simultaneously contracting with a private party to permit sale of such advertising at city-owned transit stops." 551 F.3d at 900. This scenario is similar to the one presented here. In this case, the City contracted with Cemusa for the installation, operation, and maintenance of bus shelters, automatic public toilets, newsstands, and other "public service structures." The plaintiff in *Metro Lights*, like Plaintiffs here, made the alleged "underinclusivity" of the zoning regime the "centerpiece of its First Amendment challenge on appeal." 551 F.3d at 904. The *Metro Lights* court rejected plaintiff's underinclusivity challenge. *See id.* at 911. We conclude that the same result is appropriate here.

In *Metro Lights*, Los Angeles argued "that the proliferation of offsite advertising by numerous and disparate private parties creates more distracting ugliness than a single, controlled series of advertisements on city

property over which the City wields contractual supervision." *Id.* at 910. The *Metro Lights* court accepted the city's argument, based on the reasoning and holding of *Metromedia*. *Id.* We similarly accept the City's argument that the controlled advertising regime established by its contract with Cemusa is sufficiently distinct from Plaintiffs' advertising that is subject to the zoning restrictions. And, as in *Metromedia* and *Metro Lights*, we defer to the City's judgment in controlling the placement of outdoor advertising. *Metromedia*, 453 U.S. at 512; *Metro Lights*, 551 F.3d at 910-11.

**2.   *Discovery Network*, *Rubin* and *Greater New Orleans* Dictate the Same Result as *Metromedia***

Plaintiffs do not explicitly dispute that *Metromedia* applies to their challenge to the New York City Zoning Resolution. *Clear Channel*, 608 F. Supp. 2d at 495. However, they contend that more recent Supreme Court cases, *City of Cincinnati v. Discovery Network*, 507 U.S. 410 (1993), *Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995), and *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173 (1999) require that we strike down the City's zoning regime. We reject Plaintiffs' argument; we are

-31-

persuaded that the exceptions to the Zoning Resolution do not "undermine [or] counteract its effects," *Rubin*, 514 U.S. at 489, and that the regulations "directly and materially advance[] [the City's] aim." *Greater New Orleans*, 527 U.S. at 193.

In resolving disputes, we "should follow the case which directly controls." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989). As already discussed, the Supreme Court's decision in *Metromedia* is most directly on point. It is particularly significant, in the First Amendment context, that the Supreme Court has pointed out that "[e]ach method of communicating ideas is a law unto itself and that law must reflect the differing natures, values, abuses and dangers of each method." *Metromedia*, 453 U.S. at 501. As in *Metromedia*, "[w]e deal here with the law of billboards." *Id.* And, as the Court has held, signs "pose distinctive problems that are subject to municipalities' police powers." *Ladue*, 512 U.S. at 48. This is so because "signs take up space and may obstruct views, distract motorists, displace alternative uses for land, and pose other problems that legitimately call for

regulation." *Id.* The cases relied on by Plaintiffs, which are distinguished below, must be evaluated in light of this distinct First Amendment factual and legal context.

First, *Discovery Network* is distinguishable from our case. In that case, the City of Cincinnati drew a distinction between news racks containing commercial publications and news racks containing newspapers. The distinction bore "no relationship *whatsoever* to the particular interests that [Cincinnati] ha[d] asserted." 507 U.S. at 424 (emphasis in original). By contrast, there is clearly a relationship between the City's Zoning Resolution, which regulates the placement of outdoor commercial advertising, and its interest in aesthetics and traffic safety. Evaluating the zoning scheme as a whole, we conclude that the regulations are "part of a substantial effort to advance a valid state interest." *Bad Frog Brewery,* 134 F.3d at 100.

Second, in *Discovery Network*, the city "asserted an interest in [a]esthetics," but the regulated news racks were "no greater an eyesore" than those left unregulated. *Id.* at 425. Indeed, the regulated and unregulated news racks were

identical. Therefore, they were all "equally at fault," regardless of their contents.[15] *Id.* at 426. In this case, we defer to the City's judgment that unregulated signage and billboards are a greater eyesore than coordinated street furniture bearing advertisements. The regulation in *Discovery Network* ran afoul of the principles articulated in *Central Hudson* because there was no "logical connection" between the interests asserted by Cincinnati and the regulatory scheme. *Metro Lights*, 551 F.3d at 905. The same cannot be said of New York City's Zoning Resolution.

Third, the benefit from the regulation in *Discovery Network* was deemed to be "minute or paltry." 507 U.S. at 441 (internal quotation marks omitted). Here, the City has a "sufficient basis" to believe that the impact of the zoning regulations will substantially advance its proffered interests. *See Metromedia*, 453 U.S. at 508; *see also RTM Media, LLC v. City of Houston*, 584 F.3d 220, 226-27 (5th Cir. 2009). Finally, the City of Cincinnati "enacted a

[15] There was an additional concern in *Discovery Network* that the regulated commercial speech was not sufficiently distinguishable from unregulated non-commercial speech. 507 U.S. at 419. No similar concern is implicated on the facts of the cases presently before this Court.

-34-

sweeping ban that bar[red] from its sidewalks a whole class of constitutionally protected speech." *Discovery Network*, 507 U.S. at 430. The City of New York has taken no such action. Rather, it has simply enacted regulations that control the placement of outdoor advertising.

In *Rubin*, the Supreme Court found that a provision of the Federal Alcohol Administration Act ("FAAA") that "prohibited disclosure of the alcohol content of beer on labels or in advertising" violated the First Amendment. 514 U.S. at 478. The government's asserted interest was in "curbing 'strength wars' by beer brewers who might seek to compete for customers on the basis of alcohol content." *Id.* at 483. However, the Bureau of Alcohol, Tobacco and Firearms simultaneously required disclosure of alcohol content on the labels of wine and spirits. *Id.* at 484. The Court held that the portion of the FAAA at issue "failed to advance the interest in suppressing strength wars sufficiently to justify the ban." *Id.* at 486.

*Rubin* is easily distinguishable from our case; *Rubin* involved an attempt to "suppress[] the free flow of factual information." *Id.* at 484. Here, the City makes no attempt

to limit the free flow of factual commercial information, which the Supreme Court has deemed "indispensable to the proper allocation of resources in a free enterprise system . . . [and] indispensable to the formation of intelligent opinions as to how that system ought to be regulated or altered." *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 765 (1976).

*Rubin* is further distinguishable from the factual scenario presented by these appeals because the relevant provision of the FAAA could not "directly and materially advance [the government's] asserted interest because of the overall irrationality of the . . . regulatory scheme." 514 U.S. at 488. Indeed, the "unique and puzzling regulatory framework ensure[d] that the labeling ban [would] fail to achieve" the government's asserted interest. *Id.* at 489. This was so because "other provisions of the same Act directly undermine and counteract its effects." *Id.* Irrespective of its exceptions, it simply cannot be said that the Zoning Resolution at issue undermines and counteracts its stated ends. Rather, the zoning regulations challenged by Plaintiffs present an integrated effort by the

City to reduce visual clutter, to improve the overall aesthetic appearance of the City, and to regulate traffic safety. The fact that the City has chosen to value some types of commercial speech over others, *Metromedia*, 453 U.S. at 512, does not make the regulation irrational.

In *Greater New Orleans*, the Supreme Court struck down a law that "banned broadcast advertising for most private casinos but exempted, among others, advertising for Indian tribal casinos." *Metro Lights*, 551 F.3d at 905 (citing 527 U.S. 195-96). The government maintained that the broadcasting ban directly advanced its interest in "alleviating the social costs of casino gambling by limiting demand." *Greater New Orleans*, 527 U.S. at 189. However, the Court found the regulation failed to pass constitutional scrutiny under *Central Hudson* because forbidding advertising of some casinos but not others "merely channel[s] gamblers to one casino rather than another." *Id.* Thus, the regulation was entirely "self-defeating." *See Metro Lights*, 551 F.3d at 906.

The distinctions drawn by the Zoning Resolution between permissible and impermissible locations for outdoor

commercial advertising are meaningful and do not defeat the purpose of the City's regulatory scheme. The City may legitimately allow limited and controlled advertising on street furniture, while also reducing clutter on City sidewalks. Allowing some signs does not constitutionally require a city to allow all similar signs. The zoning scheme does not result in a mere channeling effect. The City's interests in aesthetics, preservation of neighborhood character, and traffic safety continue to be advanced, even though limited and controlled advertising is permitted on street furniture.

As we have previously noted, "the Supreme Court has made clear that underinclusiveness will not necessarily defeat a claim that a state interest has been materially advanced." *Treadwell*, 294 F.3d at 463 (citing *Posadas*, 478 U.S. at 343; *Metromedia*, 453 U.S. at 511). Here, the exceptions to the Zoning Resolution do not render the scheme unconstitutional.

**E.  Plaintiffs' "Inverse Mootness" Argument Must Fail**

Plaintiffs maintain that post-litigation actions taken by the City are insufficient to cure the alleged

constitutional violation or to render the examples of infringement inapplicable to their challenge. The City objects to Plaintiffs' characterization of its efforts to enforce its zoning regulations as litigation inspired. But, the City does not argue that Plaintiffs' First Amendment challenge is moot, and rightly so. Rather, it is Plaintiffs who argue that this Court should apply a principle used in analyzing questions of mootness to this case. They contend, in effect, that recent enforcement actions taken by the City should be disregarded by this Court when considering the import of their examples of exceptions to the Zoning Resolution. However, the principles of the mootness doctrine on which Plaintiffs seek to rely are inapposite here.

In analyzing a mootness challenge, "factual changes made by a defendant after litigation has commenced cannot render a case moot unless it is absolutely clear the defendant cannot resume the allegedly offending conduct." *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000). Plaintiffs contend that, in this case, nothing prevents the City from resuming the

offending conduct. They further assert that the "heavy burden of persua[ding] the court that the challenged conduct cannot reasonably be expected to start up again lies with" the City. *Id.* at 189 (internal quotation marks omitted and alteration in original).

The voluntary cessation of allegedly illegal activity may render a case moot "if the defendant can demonstrate that (1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Campbell v. Greisberger*, 80 F.3d 703, 706 (2d Cir. 1996) (internal quotation marks omitted). Here, however, it is Plaintiffs who have erected signs and billboards in contravention of City zoning regulations. Essentially, Plaintiffs complain of a self-inflicted wound. They violated the City's duly enacted zoning ordinance and seek to justify continued violation by citing a prior history of lax enforcement. Meager past efforts at zoning enforcement are not the stuff of economic expectations. Governments generally are not estopped by the misdeeds of their agents or employees. *See, e.g., Petrelli v. City of*

*Mount Vernon*, 9 F.3d 250, 256-57 (2d Cir. 1993). "[P]rinciples of laches or estoppel do not bar a municipality from enforcing ordinances that have been allowed to lie fallow." *LaTrieste Rest. & Cabaret Inc. v. Vill. of Port Chester*, 40 F.3d 587, 590 (2d Cir. 1994).

In other words, Plaintiffs suggest that the City will simply revert to a pattern of non-enforcement after the resolution of this litigation. This argument is unpersuasive. First, the record demonstrates that the City's current efforts to remove signs from government property began well before this litigation was instituted. Second, Plaintiffs' speculation that the City will fail to enforce its regulations is insufficient. *See Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). Plaintiffs' bare allegation that the City will exhibit bad faith in failing to enforce its regulations in an evenhanded manner in the future is similarly unavailing. Indeed, just as "[s]ome deference must be accorded to a [governmental entity's] representations that certain conduct has been discontinued," *Lamar Adver. of Penn, LLC v. Town of Orchard Park*, 356 F.3d 365, 376 (2d

-41-

Cir. 2004), the City is entitled to deference with respect to its assurances that it has undertaken a good-faith enforcement effort.

In order to demonstrate that the Zoning Resolution is tailored to serve a substantial interest, the City must continue its enforcement efforts. *See Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d 12, 16-17 (2d Cir. 1999). However, this does not mean that Plaintiffs can defeat the City's asserted interest by violating the regulation. Plaintiffs' argument that we should disregard the City's recent enforcement efforts in our analysis confuses two concepts. In regulating commercial speech, the City is entitled to deference in crafting its zoning regulations. *Vill. of Massapequa Park*, 277 F.3d at 627-28. But, the requirement that a municipality enforce its zoning ordinance does not bear on the permissibility or impermissibility of exceptions that are part of the regulatory scheme. As articulated above, assuming the existence of the challenged exceptions, here, the Zoning Resolution constitutes an appropriate "fit" with the City's asserted ends. *Rubin*, 514 U.S. at 486.

Finally, to the extent that Plaintiffs are attempting to create a material issue of disputed fact based on their claim that the "City did little or nothing to enforce the Arterial Advertising Ban for decades," this is insufficient to defeat the City's motion for summary judgment. *See Park Ave. Tower Assocs. v. City of N.Y.*, 746 F.2d 135, 141 (2d Cir. 1984). Plaintiffs have not met their burden to come forward with admissible evidence that the City will fail to enforce its zoning regulations in the future. To the contrary, the evidence suggests that the City is now undertaking a concerted effort to enforce the Zoning Resolution.

**F.  New York City's Registration and Documentation Scheme is a Constitutionally Permissible Regulation of Commercial Speech**

The Clear Channel Plaintiffs argue that the documentation and registration requirements set out in Local Laws 14 and 31, and Department of Buildings ("DOB") Rule 49 are unconstitutional under the standards established by *Central Hudson*. Rule 49 lays out the criteria that must be satisfied by an outdoor advertising company that seeks to demonstrate that one of its signs should be accorded non-

-43-

conforming use status. *Clear Channel*, 608 F. Supp. 2d at 504. A sign with non-conforming use status is not subject to the Zoning Resolution and may carry offsite arterial advertising. *Id.*

Plaintiffs maintain that the documentation and registration requirements do not materially advance the City's interests. Plaintiffs insist that they will replace commercial copy on existing signs with non-commercial copy. Plaintiffs also argue that the requirements are unduly onerous because much of the documentary evidence is now unavailable. We disagree. Given the outdoor advertising industry's history of non-compliance with zoning regulations, the registration and documentation requirements are narrowly tailored and not more extensive than necessary to aid the City in its enforcement efforts.

The City's decision to place the onus on outdoor advertising companies to demonstrate that signs and billboards are entitled to non-conforming use status is a reasonable regulatory choice.[16] The fact that the Clear

---

[16] To the extent that DOB Rule 49 simply requires disclosure of factual information that allows the City to determine whether outdoor advertising billboards comply with

-44-

Channel Plaintiffs have not preserved documents that would allow them to obtain non-conforming use status does not make DOB Rule 49, or the attendant local laws, constitutionally troubling.[17]

Plaintiffs' argument that DOB Rule 49 does not pass constitutional scrutiny because they will simply convert their signs into signs bearing non-commercial copy is unavailing. The City is not required to "make progress on every front before it can make progress on any front." *Edge Broad. Co.*, 509 U.S. at 434. Therefore, the City is not required to show that the operation of the local laws and DOB Rule 49 will result in the elimination of every sign improperly claiming non-conforming use status. *See Infinity Outdoor, Inc.*, 165 F. Supp. 2d at 417-19. The registration and documentation provisions present a solution that is a "reasonable fit" with the City's substantial interest in

the applicable zoning regulations, our review is more lenient than our review of regulations that restrict accurate commercial speech. *See N.Y. State Rest. Ass'n v. N.Y. City Bd. of Health*, 556 F.3d 114, 132 (2d Cir. 2009).

[17] Some signs and billboards most assuredly will not have any documentation. None was ever submitted for those signs erected illegally.

achieving compliance with the Zoning Resolution.  *See*

*Treadwell*, 294 F.3d at 461-62.  That is all that is

required.

**G.    Plaintiffs' New York State Constitutional Challenge was Properly Rejected by the District Court**

As recognized by the district court, the New York Court of Appeals has construed the provision of the New York State Constitution that pertains to freedom of speech, N.Y. Const. art. I, § 8, as containing language that may be read more expansively than the First Amendment.[18]  *See, e.g.*, *O'Neill v. Oakgrove Constr., Inc.*, 71 N.Y.2d 521, 529 n.3 (1988) ("The protection afforded by the guarantees of free press and speech in the New York Constitution is often broader than the minimum required by the First Amendment.").  As a result, the New York Court of Appeals has, at times, interpreted Article I, § 8 in a manner that is distinct or more protective of free expression than the safeguards afforded by the First Amendment to the federal Constitution.

---

[18] In relevant part, Article I, § 8 of the New York Constitution states: "Every citizen may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain the liberty of speech or of the press."

*See Immuno AG v. Moor-Jankowski*, 77 N.Y.2d 235, 248-49 (1991) (Kaye, J.); *see also People v. Ferber*, 57 N.Y.2d 256, 259 (1982) (per curiam).  For example, in discussing "[f]reedom of expression in books, movies and the arts," the New York Court of Appeals has held that "the minimal national standard established by the Supreme Court for First Amendment rights cannot be considered dispositive in determining the scope of [New York's] constitutional guarantee of freedom of expression."  *People ex rel. Arcara v. Cloud Books, Inc.*, 68 N.Y.2d 553, 557-58 (1986).

We affirm the district court's holding with respect to the Clear Channel Plaintiffs' state law claim to the extent that the court determined that, under the circumstances presented by this case, the New York Court of Appeals has not articulated a stricter standard for regulation of commercial speech than that imposed by the federal Constitution.[19]  *See Clear Channel*, 608 F. Supp. 2d at 508-

---

[19] Even if the category of commercial speech is more narrowly circumscribed under New York law, *see, e.g., N.Y. Pub. Interest Research Group, Inc. v. Ins. Info. Inst.*, 554 N.Y.S.2d 590, 592 (1st Dep't 1990), no party disputes that the speech at issue in this litigation is properly defined as commercial speech.

09.  Indeed, the New York Court of Appeals has explicitly invoked the *Central Hudson* test in evaluating restrictions on commercial speech.  *See In re von Wiegen*, 63 N.Y.2d 163, 172-73 (1984); *Koffler v. Joint Bar Ass'n*, 51 N.Y.2d 140, 147 (1980).  Therefore, we affirm the district court's holding that the City's zoning regulations do not offend the New York State Constitution.

### IV.  CONCLUSION

For the reasons set forth above, we conclude that the challenged provisions of the New York City Zoning Resolution do not impose unconstitutional restrictions on Plaintiffs' commercial speech rights in violation of the First Amendment or the New York State Constitution.  We have considered Plaintiffs' remaining arguments, and find them to be without merit.  Accordingly, the district court properly granted summary judgment in favor of Defendants, and its order of March 31, 2009 is hereby **AFFIRMED.**