21-184
*Valtus Capital Group, LLC v. Parq Equity Limited Partnership, et al.*

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

# SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 21st day of January, two thousand twenty-two.

PRESENT:
      SUSAN L. CARNEY,
      STEVEN J. MENASHI,
      MYRNA PÉREZ,
            *Circuit Judges.*
_____

VALTUS CAPITAL GROUP, LLC,

    *Plaintiff-Appellee,*

        v.                                   No. 21-184

PARQ EQUITY LIMITED PARTNERSHIP, PARQ
HOLDINGS LIMITED PARTNERSHIP, PARQ
VANCOUVER LIMITED PARTNERSHIP, PARQ
VANCOUVER ULC, 1010094 B.C. LTD.,

    *Defendants-Appellants.*
_____

FOR APPELLEE:                        JOSEPH B. SCHMIT (Richard Weingarten,
                                    *on the brief*), Phillips Lytle LLP, New York,
                                    NY.

FOR APPELLANTS: DAVID A. CRICHLOW (Craig A. Convissar, Kelly D. Hine, *on the brief*), Katten Muchin Rosenman LLP, New York, NY.

Appeal from a judgment of the United States District Court for the Southern District of New York (Cote, *J.*).

**UPON DUE CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment entered on December 30, 2020, is **AFFIRMED**.

Defendants-Appellants Parq Equity Limited Partnership and related entities (together, "Parq") engaged an investment bank, Plaintiff-Appellee Valtus Capital Group, LLC ("Valtus"), to find investors and secure financing for Parq's corporate operations. Pursuant to a Private Placement Agreement ("PPA") that the parties signed in November 2017, Valtus helped Parq structure a series of five agreements with Westmont Hospitality Group (the "Westmont transaction") through which Westmont provided $272 million (Canadian) of funding to Parq in exchange for a 55% equity stake in Parq and three of the five seats on its board of directors. The PPA set Valtus's compensation as a percentage of the gross proceeds of "any Private Placement of Securities," which was defined as "any proposed offer and sale by [Parq] of equity" or "equity-linked securities." Joint App'x at 541–42.

In April 2019, Valtus sued Parq alleging a breach of contract after Parq failed to pay Valtus a fee related to the Westmont transaction. Parq does not dispute that it must pay Valtus compensation based on three of the five financing agreements that constitute the Westmont transaction. These three involved loans by a Westmont entity that convert directly to equity upon the entire transaction's closing. Parq contends, however, that it does not owe Valtus a fee based on the financing provided in two of the five transactions. These two, known as the First Interim Advance and the Second Lien Loan, together provided 84% of the Westmont transaction's total financing. Parq presses the view that those two agreements involved securities that are not "equity-linked."

The district court found that the PPA is unambiguous and requires Parq to pay Valtus a fee based on sums conveyed to Parq in the entire Westmont financing, including through the First Interim Advance and the Second Lien Loan. It therefore granted Valtus's motion for summary judgment and denied Parq's cross-motion for summary judgment. Parq now appeals. We assume the parties' familiarity with the underlying facts, procedural history, and arguments on appeal, to which we refer only as necessary to explain our decision to affirm.

We review *de novo* a district court's order granting summary judgment, resolving all ambiguities and drawing all inferences against the moving party. *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014) (*per curiam*); *Clear Channel Outdoor, Inc. v. City of New York*, 594 F.3d 94, 103 (2d Cir. 2010) (applying same standard to cross-motions for summary judgment). "Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Doninger v. Niehoff*, 642 F.3d 334, 344 (2d Cir. 2011).[1]

"[T]he initial question for the court on a motion for summary judgment with respect to a contract claim is whether the contract is unambiguous with respect to the question disputed by the parties." *Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010). "[A] contract is unambiguous if the language it uses has a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011). Determining whether a contract is unambiguous presents a question of law for the court. *Law Debenture Trust Co.*, 595 F.3d at 465.

The PPA provides that, "[a]s compensation for [Credit Suisse and Valtus's] services hereunder, [Parq] agrees to pay Credit Suisse and Valtus a placement fee (the '*Fee*'), which Fee shall be equal to 4.25% of the gross proceeds of any Private Placement of Securities"

---

[1] Unless otherwise noted, in quoting caselaw, this Order omits any alterations, citations, footnotes, and internal quotation marks.

and shall be split equally between Valtus and Credit Suisse.[2] Joint App'x at 542. The term "*Private Placement*," in turn, is defined as "any proposed offer and sale by [Parq] of equity (including preferred stock and limited partnership interests or units) or equity-linked securities of [Parq] (the '*Securities*')." *Id.* at 541. The parties dispute the definition of "equity-linked securities" and whether the First Interim Advance and Second Lien Loan involve such securities.

Parq contends that "equity-linked securities" is an industry term of art that unambiguously excludes those transactions. The district court properly rejected this argument. Under New York law, the court may consider evidence of an industry's custom and usage "where necessary to understand the context in which the parties have used terms that are specialized." *Law Debenture Trust Co.*, 595 F.3d at 466. The party advocating for a custom and trade usage "must establish either that the party sought to be bound was aware of the custom, or that the custom's existence was so notorious that it should have been aware of it." *British International Insurance Co. v. Seguros La Republica, S.A.*, 342 F.3d 78, 84 (2d Cir. 2003). Stated differently, "[t]he trade usage must be so well settled, so uniformly acted upon, and so long continued as to raise a fair presumption that it was known to both contracting parties and that they contracted in reference thereto."[3] *Id.*

Parq has not met its burden under this demanding standard. Parq suggests that the parties' respective experts both recognized that the term "equity-linked securities" has a specialized meaning. Neither of the experts purported to recognize a specialized definition

---

[2] After the Westmont transaction closed, Credit Suisse and Parq negotiated a separate agreement between themselves relating to the fee that Parq owed to Credit Suisse under the PPA. Credit Suisse is not a party to this litigation.

[3] In its reply brief, Parq argues for the first time that a 2014 amendment to New York's Uniform Commercial Code ("UCC") adopted a more relaxed standard for establishing a custom or trade usage. Parq has not demonstrated that the UCC—which governs contracts involving the sale of goods—has any bearing on this contract dispute, which involves a contract for investment banking services. *See* N.Y. U.C.C. Law § 2-106 (McKinney 2014); *Hagman v. Swenson*, 149 A.D.3d 1, 5 (N.Y. App. Div. 1st Dep't 2017). Nor has Parq cited any authority suggesting that the language it quotes from the UCC commentary effected any change in law with respect to establishing a custom or trade usage; indeed, New York's UCC had long contained identical language before its 2014 reenactment. *See* N.Y. U.C.C. Law § 1-205 cmts. 1, 7 (McKinney 2013), *reenacted by* L. 2014, c. 505, § 1, eff. Dec. 17, 2014.

4

that necessarily excludes the First Interim Advance and Second Lien Loan. The parties' experts agreed on only the general, high-level definition of the term provided by Parq's expert: that an equity-linked security is one that "involves a security entailing potential issuance of a company's common stock." Joint App'x at 950; *see also id.* at 993 (Valtus's expert "agree[ing] with [the] general definition"). That general definition does not shed light on the issue that the experts—and the parties—disagree about, which is whether issuance of non-convertible debt is considered "equity-linked" when it is a condition precedent to the closing of an equity transaction. Indeed, Parq's expert submits that "[a]mong the most common types of [equity-linked securities] are securities that allow for the conversion into shares of a company's common stock," an assertion that does not exclude transactions executed through other types of instruments like the Second Lien Loan and the First Interim Advance. *Id.* at 950. Accordingly, Parq has failed to meet its burden to show that Valtus was aware of the specific definition that Parq asserts was associated with equity-linked securities as a term of art, or that the definition's existence was so notorious that Valtus should have been aware of it. *See British International Insurance Co.*, 342 F.3d at 83–84.

Absent a showing that "equity-linked securities" has an established, specialized meaning that excludes the First Interim Advance and Second Lien Loan, the district court properly found that the term unambiguously made those transactions part of a private placement for which Valtus must be compensated under the PPA. The words used in a contract "should be given the meanings ordinarily ascribed to them and absurd results should be avoided." *Mastrovincenzo v. City of New York*, 435 F.3d 78, 104 (2d Cir. 2006). New York courts regularly "refer to the dictionary to determine the plain and ordinary meaning of words to a contract." *10 Ellicott Square Ct. Corp. v. Mountain Valley Indem. Co.*, 634 F.3d 112, 120 (2d Cir. 2010). The district court appropriately consulted the Oxford English Dictionary, which defines the adjective "linked" as "joined, coupled, associated." *Valtus Cap. Grp., LLC v. Parq Equity Ltd. P'ship*, No. 19-CV-4737 (DLC), 2020 WL 7360338, at *8 n.7 (S.D.N.Y. Dec. 15, 2020) (quoting *Linked*, Oxford English Dictionary (2d ed. 1989), https://www.oed.com/oed2/00133735). In other words, a security is equity-linked if it is joined, coupled, or associated with a transaction that involves equity. Under that ordinary

5

definition, the district court correctly concluded that "a security that is a condition precedent to the issuance of equity is 'linked' to equity." *Id.*

This ordinary definition of "equity-linked securities" accords with the PPA's purpose and structure. *See Steiner v. Lewmar, Inc.*, 816 F.3d 26, 33 (2d Cir. 2016) ("In determining whether the contract is ambiguous, a court looks at the contract as a whole in light of the circumstances present when the contract was entered."). The PPA states that Parq "intend[ed] to raise capital for general corporate purposes" through the private placement. Joint App'x at 541. Valtus's services under the PPA included identifying potential purchasers and structuring, negotiating, and advising Parq on any private placement. The PPA sets Valtus's compensation for those services as a percentage of the "gross proceeds" of any private placement—a broad term whose definition in the PPA aligns with the broad purpose of the private placement ("rais[ing] capital") and the broad, ordinary definition of "equity-linked securities" discussed above. *Id.* at 541-42. Indeed, to interpret "equity-linked securities" more narrowly would create the absurd result that Westmont and Parq could restructure a private placement as a substantially similar transaction that accomplishes the same financial result, simply in order to avoid paying Valtus a fee for the majority of the raised capital.

Applying the ordinary, unambiguous definition of "equity-linked securities," we identify no genuine dispute of material fact over whether the PPA requires Parq to compensate Valtus based on the financing secured through the First Interim Advance and the Second Lien Loan. For the reasons detailed in the district court's decision and as Parq conceded at oral argument in this court, the closing of the Second Lien Loan was a condition precedent to the transfer of an equity interest to Westmont.[4] Westmont's equity investment simply would not have occurred without the financing provided through the

---

[4] When the Second Lien Loan closed, the First Interim Advance automatically converted into the principal of the Second Lien Loan, the obligations associated with the First Interim Advance were extinguished, and the terms of the Second Lien Loan governed the financing that was initially provided through the First Interim Advance. Thus, the financing initially provided through the First Interim Advance is equity-linked to the same extent as the financing initially provided in the Second Lien Loan.

First Interim Advance and the Second Lien Loan. Those financing agreements are therefore correctly considered to be sales and offers of equity-linked securities.[5] Under the PPA's unambiguous terms, Parq must pay Valtus a fee based on the total financing secured through the Westmont transaction, including the First Interim Advance and the Second Lien Loan. The district court properly granted summary judgment to Valtus on its breach of contract claim.[6]

* * *

We have considered Parq's remaining arguments and find in them no basis for reversal. For the reasons set forth above, the judgment of the district court is **AFFIRMED**.

FOR THE COURT:

Catherine O'Hagan Wolfe, Clerk of Court

---

[5] The opinion of Parq's expert that the First Interim Advance and the Second Lien Loan are not equity-linked securities does not create a genuine issue of material fact. *See Dalberth v. Xerox Corp.*, 766 F.3d 172, 189 (2d Cir. 2014) (explaining that "an expert's report is not a talisman against summary judgment" and "summary judgment is not *per se* precluded because there are conflicting experts"). That is particularly true here because, as the district court correctly observed, Parq's expert's broad "definition of an equity-linked security would include a security like the Second Lien Loan, whose closing is a condition precedent to the issuance of stock." *Valtus Cap. Grp.*, 2020 WL 7360338, at *9.

[6] Furthermore, although we need not look beyond the PPA because we find it unambiguous, our interpretation of the PPA is confirmed by the record evidence of the parties' course of conduct after entering into it. As the district court detailed in its thorough opinion, the structure and context of the Westmont transaction and the record evidence of the parties' communications confirm that the parties' intent was for the term "equity-linked securities" to be defined broadly and to encompass the entire amount of financing obtained through a private placement. Under the circumstances presented in this case, no reasonable jury could find otherwise. *See SCS Communications, Inc. v. Herrick Co.*, 360 F.3d 329, 342 (2d Cir. 2004).